**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

DISABILITY RIGHTS NEW YORK,

                  _Plaintiffs,_

           -against-

NORTH COLONIE BOARD OF EDUCATION,
North Colonie Central Schools, and
Mr. D. Joseph Corr, in his official capacity as the
Superintendent of North Colonie Central Schools,

                  _Defendants._

_____

**Memorandum in Support of
Plaintiff's Motion for Preliminary
Injunction and Temporary
Restraining Order**

Case No. 1:14-CV-0744 (DNH/RFT)

## INTRODUCTION

Disability Rights New York (hereinafter "DRNY") has received several complaints that students with disabilities in the Blue Creek Elementary School have been and are being subjected to abuse and neglect. DRNY has brought an action to challenge the North Colonie Board of Education, North Colonie Central Schools and Superintendent D. Joseph Corr's (collectively "Defendants") refusal to grant DRNY access to Blue Creek Elementary School.  The denial of access by Defendants prevents DRNY, the state and federally designated Protection and Advocacy System for persons with disabilities in New York, from fulfilling the statutory mandates of investigating allegations of abuse and neglect as well as providing protection and advocacy services for individuals with disabilities. Immediate access must be granted to Plaintiff so it can carry out its mandate to investigate complaints of alleged abuse and neglect of individuals with disabilities.

**FACTS**

On April 22, 2014, DRNY received a complaint by telephone alleging a student from the Defendant's Blue Creek Middle School Academic Skills Class ("ASC 3-5) was a victim of verbal and physical harassment by a staff person in the ASC 3-5 program. Dec. of Keegan, ¶ 12. The ASC 3-5 program is a self-contained class for students with a variety of developmental disabilities, mental illness and/or disabilities that impact learning and manifest in significant behavioral challenges at school. Dec. of Keegan, ¶ 13.  The class size has ranged from seven to ten students in each of the past three years. Dec. of Keegan, ¶ 13.  The class is staffed by a Special Education teacher, a Teaching Assistant and two or more aides. Dec. of Keegan, ¶ 13.

On May 9, 2014, DRNY received two additional complaints by telephone alleging abuse and neglect of students currently placed in the ASC 3-5 class. Dec. of Keegan, ¶ 14.  These Complainants reported acts of abuse and neglect which they had direct knowledge of or which was reported to them by their respective student, and which corroborated information provided in the April 22 complaint. Dec. of Keegan, ¶¶ 14 - 15.   In addition, both Complainants alleged violations of the Individuals with Disabilities Education Act (IDEA) and reported that their respective students do not have Behavior Intervention Plans despite a history of significant behaviors at school that impede learning and the learning of others. Dec. of Keegan, ¶16.

On June 5, 2014, one of the May 9, 2014 complainants reported an additional incident of neglect by the District Nurse that put the student at substantial risk of harm or death. Dec. of Keegan, ¶ 17.

On May 13, 2014, DRNY received a complaint from a fourth complainant that Defendants regularly uses an unsafe setting at times for ASC 3-5 students which setting poses a serious risk of injury or death. Dec. of Keegan, ¶ 18.  The Fourth Complainant also reported an incident that occurred in early May

2014 which, due to the District's neglect, put the student in imminent danger of injury or death. Dec. of Keegan, ¶ 19.

On May 30, 2014, DRNY received a fifth complaint alleging abuse and neglect of a student who had been physically restrained multiple times while in the ASC 3-5 program. Dec. of Keegan, ¶ 20. The complainant stated that the student's behavior has severely escalated and that the Defendants did not make any effort to conduct a functional behavior assessment or develop a systematic behavior intervention plan as is required by federal and State law to avoid unnecessary physical intervention. Dec. of Keegan, ¶ 21.

On June 2, 2014, the Fifth Complainant reported to DRNY two separate incidents occurring that day reported by staff of the ASC classroom. These two incidents exposed the student to substantial risk of injury or death multiple times. Dec. of Keegan, ¶ 22.

On June 9, 2014, DRNY received a sixth complaint reporting that students in the ASC 3-5 classroom are often removed from the primary classroom to a nearby bathroom to which desks, books, and toys have been added to the existing open toilet area and open shower area. Dec. of Keegan, ¶ 23. The sixth complainant alleged that the shower fixture is comprised of a metal showerhead attached to a movable metal hose that can be stretched away from the wall. Dec. of Keegan, ¶ 24. The door to this room can be locked from inside and students have locked adults out on several occasions. This space is used as a supplementary space of the primary classroom, which is also very small. Dec. of Keegan, ¶ 24.

Complainants have also reported that students in the ASC program: (1) have attempted to choke or strangle themselves with shoelaces or belts and present with threats of suicide; (2) are routinely "escorted" using a physical intervention in which two adults restrain the arms of a student who is physically acting out or threatening harm and physically move the student to another location without

notice to the parents as required by State law; (3) are frequently verbally abused and physically harassed to the point that the students become agitated and aggressive. Dec. of Keegan, ¶¶ 25-27.

Based on the nature, number and credibility of the complaints received, DRNY determined an expanded investigation of the ASC programs at Blue Creek Elementary School was warranted, including access to the locations within the school used by the ASC program and observation of the students in these locations. Dec. of Keegan, ¶¶ 28-29.

By letter dated June 12, 2014 to D. Joseph Corr, Superintendent of the District, and David Semo, Director of Pupil Services at the District, DRNY, citing to its authority as New York State's designated Protection and Advocacy System, requested access to all areas and locations throughout the school available to students in the ASC programs on June 17, 2014 between the hours of 8:00 AM and 4:00 PM. Dec. of Keegan, ¶ 30.

By letter dated and received by DRNY on June 16, 2014 at 2:43 PM, Kenneth Ritzenberg, Attorney for the District, denied DRNY access to Defendants' building and program. Dec. of Keegan, ¶ 31.

At approximately 3:45 PM on June 16, 2014, in a phone conversation and in a subsequent electronic mail communication with Mr. Ritzenberg, DRNY attorney Julie M. Keegan responded to the District's unsubstantiated challenges to DRNY access authority and confirmed DRNY's intention to seek access before the school year ended. Dec. of Keegan, ¶ 32. After consulting with the Defendants, Mr. Ritzenberg replied by email that the District remained unwilling to grant DRNY access. Dec. of Keegan, ¶ 32.

Access to the ASC 3-5 programs and students is essential to DRNY's obligation to fully investigate the numerous reports of acts and omissions that constitute abuse and neglect under DRNY's authorizing statutes and regulations. The last day of classes for these students is June 26, 2014. Dec. of

Keegan, ¶35.  Gaining access to the program after that date will defeat the very purpose of the access sought.

**ARGUMENT**

**POINT I**
**DRNY IS A PROTECTION AND ADVOCACY SYSTEM AND IS ENTITLED TO ACCESS BLUE CREEK ELEMENTARY SCHOOL**

**DRNY is New York State's Protection and Advocacy System**

DRNY is New York State's designated Protection and Advocacy System and as such operates the states Protection and Advocacy for Individuals with Developmental Disabilities (PADD); Protection and Advocacy for Individuals with Mental Illness (PAIMI) and the Protection and Advocacy for Individual Rights (PAIR) programs.  Dec. of Keegan, ¶ ¶ 6, 8, 10.

In 1975 Congress drafted the Developmental Disabilities Assistance and Bill of Rights Act [DD Act] because of the concerns it had regarding instances of abuse of developmentally disabled persons. 42 U.S. C. §15001(a).  As described by one court:

> [d]isturbed by the inhumane and despicable conditions discovered at New York's Willowbrook State School for persons with developmental disabilities, Congress enacted the Developmental Disabilities Assistance and Bill of Rights Act ... to protect the human and civil rights of this vulnerable population.

*Wisconsin Coalition for Advocacy v. Czaplewski,* 131 F. Supp.2d 1039, 1045 (E.D. Wis. 2001) citing *Alabama Disabilities Advocacy Program v. Tarwater Developmental Ctr.,* 97 F.3d 492, 494 (11th Cir. 1996).

The DD Act established the Protection and Advocacy System [P&A] "to protect the legal and human rights of individuals with developmental disabilities." 42 U.S.C. § 15001(b)(2). To accomplish this goal, Congress granted broad authority to "investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to

believe that the incidents occurred." 42 U.S.C. § 15043(a)(2)(B). The Plaintiff, Disability Rights New

York, is the state and federally designated protection and advocacy system in New York.  New York

Executive Law § 558.

Similarly, in 1986 Congress enacted the Protection and Advocacy for Individuals with Mental

Illness Act. 42 U.S.C. §§ 10801-10827[PAIMI Act].[4]  Congress found that "individuals with mental

illness are vulnerable to abuse and serious injury" as well as "neglect, including lack of treatment,

adequate nutrition, clothing, health care, and adequate discharge planning." 42 U.S.C. § 10801(a)(l) and

(3). Moreover, Congress found that "[s]tate systems for monitoring compliance with respect to the rights

of individuals with mental illness vary widely and are frequently inadequate." 42 U.S.C. § 10801(a)(4).

Accordingly, Congress granted P&As the same powers found under the DD Act: the power to

"investigate incidents of abuse and neglect of persons with mental illness if the incidents are reported to

the system or if there is probable cause to believe that incidents occurred." 42 U.S.C. § 10805(a)(1)(A).

In order to conduct its investigations, both the DD Act and the PAIMI Act provide a P&A with broad

authority access to facilities at times when service recipients are present. 42 U.S.C. § 10543(a)(2)(H)

and (1), 42 U.S.C. § 10805(a)(3) and (4),42 U.S.C. § 10806,45 C.F.R. § 1386.22,42 C.F.R. § 51.42.

> A system shall have reasonable unaccompanied access to public and private
> facilities which provide services, supports, and other assistance for individuals
> with developmental disabilities in the State when necessary to conduct a full
> investigation of an incident of abuse or neglect under section 142(a)(2)(B) of the
> [DD] Act. This authority shall include the opportunity: to interview any facility
> service recipient, employee, or other person, including the person thought to be
> the victim of such abuse, who might be reasonably believed by the system to have
> knowledge of the incident under investigation; and to inspect, view and
> photograph all areas of the facility's premises that might be believed by the
> system to have been connected with the incident under investigation.

45 C.F.R. § 1386.22(f)[1]

---

[1] See also id. § 1386.22(g) (noting that the system "shall have unaccompanied access to all residents of a
facility at reasonable times, which at a minimum shall include normal working hours and visiting hours"
for the purposes of fully investigating alleged abuse and neglect).

Finally, the Protection and Advocacy of Individual Rights Act [PAIR Act] provides services to individuals with disabilities that are neither developmental disabilities as defined by the DD Act nor mental illness as defined by PAIMI Act. 29 U.S.C. § 794e(a)(l)(B). As an example, an individual with a learning disability would be eligible for services under PAIR. P&As providing services under PAIR enjoy the same general authorities as those set forth in the DD Act, and are similarly able to investigate incidents of abuse and neglect of individuals with disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred. 42 U.S.C. § 15043(a)(2)(B). 29 U.S.C. § 794e(f); see also, *Connecticut Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d at 240-241.

The DD Act, PAIMI Act and PAIR Act require states to permit the P&A agency to operate effectively and with broad discretion and independence in gaining access to facilities and records. The Fifth Circuit expounded upon this obligation as follows:

> The Act not only describes the range of services to be provided by the protection and advocacy systems, it also states that the systems **must have the authority** to perform these services. The state cannot satisfy the requirements of the [DD Act] by establishing a protection and advocacy system which has this authority in theory, but then taking action which prevents the system from exercising that authority.

*Mississippi Prot. & Advocacy Sys., Inc. v. Cotton,* 929 F.2d 1054, 1059 (5th Cir. 1991) (emphasis in original).

As the Court noted in *Alabama Disabilities Advocacy Program v. Tarwarter Developmental Ctr.,* any other reading "would attribute to Congress an intent to pass an ineffective law." *Alabama Disabilities Advocacy Program v. Tarwater Developmental Ctr.,* 894 F. Supp. 424, 429 (M.D. Ala. 1995), *aff'd,* 97 F.3d 492 (11th Cir. 1996).

**Blue Creek Elementary School is a Location under the DD Act, PAIMI Act and PAIR Act**

Blue Creek is a "location" and a "facility," within the meaning of the DD Act, PAIMI Act and PAIR Act to which DRNY is entitled to access.  DRNY must "'have access at reasonable times to any individual with a developmental disability [mental illness, and other disability] in a location in which services, supports, and other assistance are provided to such an individual....' 42 U.S.C. § 15043(a)(2)(H); 29 U.S.C. § 794e(f)(2); <u>see also</u>, 42 U.S.C. § 10805(a)(3); 42 C.F.R. § 51.42,45 C.F.R. § 1386.22(f); 42 U.S.C. § 10805(a)(3).

The Second Circuit has firmly settled that the P&A are entitled to access public, non-residential schools and held that the DD Act, PAIMI Act and PAIR Act all authorize such access. *Connecticut Office of Prot. & Advocacy for Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d at 238 – 242.

> To the extent that the [school program] is a location that provides care or treatment to individuals with disabilities within the meaning of PAIR and the DD Act, a [P & A system] is authorized to have reasonable access to the [school program] and its students during school hours both to investigate specific allegations and to monitor whether the school is respecting students' rights and safety.

*Id. at* 242.

The Second Circuit also concluded that "the term 'facilities' for purposes of PAIMI includes non-residential facilities that provide care or treatment to individuals with mental illness." *Id.* at 240. Likewise, other courts have uniformly confirmed a P & A's access authority extends to public schools serving students with disabilities.  <u>See, e.g</u>*, Disability Law Center of Alaska Inc., v. Anchorage School District*, 581 F.3d 986 (9th Cir. 2009); *Disability Rights Wisconsin v. State of Wisconsin Dep't of Public Instruction*, 463 F.3d 719 (7th Cir. 2006).

**DRNY has the Required Basis to Seek Access to Blue Creek Elementary School.**

DRNY has received six complaints that students in the Defendants' Blue Creek Elementary School ASC 3-5 classroom have been and continue to be subjected to abuse and neglect. Dec. of Keegan, ¶¶ 12, 14 - 27. Under federal and State law, DRNY is authorized to fully investigate any complaint it receives that alleges abuse or neglect occurring in any public or private entity that provides care, services, treatment and/or habilitation to persons with disabilities. 42 U.S.C. § 15043 (a)(2)(B); 45 C.F.R. § 1386.22(f); 42 U.S.C. §10805(a)(1)(A) and 29 U.S.C. § 794e (f)(2);  NY Executive Law §558(b).  Specifically, a state's P & A system for persons with developmental disabilities "shall have the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities *if the incidents are reported to the system* or if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 15043(2)(B) (emphasis added). Similarly, a state's PAIMI program and its PAIR program have the same authority with respect to their respective service populations.  *See respectively,* 42 U.S.C. §10805(a)(1)(A) and 29 U.S.C. § 794e (f)(2).

Here, DRNY has received multiple reports of abuse and neglect in the ASC 3-5 program and "[t]o the extent that the [school program] is a location that provides care or treatment to individuals with disabilities within the meaning of PAIR and the DD Act, a [DRNY] is authorized to have reasonable access to the [school program] and its students during school hours both to investigate specific allegations and to monitor whether the school is respecting students' rights and safety." *Connecticut Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 242 (2d Cir. 2006).

Further, DRNY is also authorized to monitor a facility or program's compliance with respect to the rights and safety of individuals with disabilities and individual treatment plans. 45 C.F.R. §

1386.22(g)(2); 42 C.F.R. § 51.42(c)(2).  Thus, under its investigatory and monitoring authority,  DRNY

has the statutory basis to the access it seeks to Defendants' the Blue Creek Elementary School.


### POINT II

**DRNY'S DUTY TO INVESTIGATE THE COMPLAINTS INVOLVING STUDENTS WITH DISABILITIES AT BLUE CREEK ELEMENTARY SCHOOL MEETS THE REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.**

DRNY is entitled to a temporary restraining order because it suffers immediate and irreparable

injury due to Defendants obstruction of its statutory obligation to investigate complaints of abuse and

neglect. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the

merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def.*

*Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted); see also, *Salinger v. Colting,* 607 F.3d 68, 80

(2d. Cir 2010).

**DRNY is Likely to Succeed on the Merits of its Claims.**

As set forth in detail in Point I, *supra*, the access requested by DRNY falls squarely within

DRNY's federal statutory access authority. The DD Act, PAIMI Act and PAIR Act authorizes DRNY's

access to public and private facilities, including public school programs, which provide services,

supports, and other assistance for individuals with developmental disabilities (42 U.S.C. § 15043[f]),

mental illness (42 U.S.C. §10805[a][1][A]) and other disabilities (29 U.S.C. § 794e [f][2]).  See also,

*Connecticut Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d

229 (2d Cir. 2006) which squarely stood for the proposition that the P&A is entitled to access.

**DRNY Will Suffer Irreparable Harm Without the Court's Intervention.**

DRNY will suffer irreparable harm if denied an order providing DRNY access to Blue Creek Elementary School. Based on the multiple reports of abuse and neglect DRNY has received, observation of the students while in the ASC 3-5 program as well as observation of the operation of the program "as is" is fundamental to our mandate to fully investigate incidents of abuse and neglect. See, § 15043(a)(2)(B), (H). This opportunity will end on June 26, 2014, the last day of classes at Blue Creek. After that date, the students involved in the reports of abuse and neglect will be unavailable for observation and interviews in the setting in which the abuse and neglect has occurred. Further, since some of the complaints involve the physical environment of the program, alterations to the environment may occur deliberately or in the normal course of Defendants' operation of the school.

Moreover, the harm to DRNY is irreparable. "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." Salinger v. Colting, 607 F.3d 68, 81 (2d Cir. 2010). Because of the very nature of the intervention sought, any remedy other than immediate access to the Blue Creek Elementary School is wholly ineffective. Indeed, courts have consistently concluded that interference with a P&A system's investigative authority constitutes sufficient irreparable harm to support injunctive relief. "[D]efendant's refusal to provide it [P&A agency] with the records it is entitled to review (indeed charged to review as a part of its responsibilities does, in a very real and readily identifiable way, pose a threat to the plaintiff's being able to discharge its obligations. And no amount of damages will remedy that sustained harm." *Wisconsin Coalition for Advocacy, Inc. v. Czaplewski*, 131 F.Supp.2d 1039, 1050 - 1051 (E.D. Wisc., 2001); see also, *Iowa Protection and Advocacy, Inc. v. Gerard Treatment Programs*, 152 F.Supp.2d 1150, 1173 (N.D. Iowa, 2001) "[Iowa's Protection & Advocacy System] is still irreparably harmed by being prevented from pursuing fully its right to access records and patients."

11

The serious and irreparable nature of the harm sustained by DRNY as a result of Defendant's refusal to provide the requested access, and lack of adequate remedy at law without the court's intervention support plaintiff's motion for injunctive relief.

**The Balance of Hardships Weighs Heavily in Favor of DRNY**

DRNY's access to Blue Creek School poses little or no hardship to Defendants.  Blue Creek Elementary School is a *public* school in which hundreds of students, adults and parents visit the building and specific classrooms each day.  DRNY has sought access to observe the educational program and will do so without any intentional disruption of the operation of the Defendants' program.  The Defendants permit parents and other community experts into its facilities and programs for the purpose of observation and DRNY's request to see the Defendants' program is of no greater burden.  Further, Defendants did not articulate any hardship as the basis for their refusal to allow DRNY access.  Dec. of Keegan 31, (Exhibit 2). Any minor disruption to the ASC programs or students is certainly outweighed by the need to ensure that such students are free from abuse and neglect. Finally, the hardship posed by denial of immediate access is irreparable as set forth, *supra*.

**The Public Interest will be Advanced by the Provision of Preliminary Relief**

Blue Creek Elementary School is a public school operated with public funds.  Likewise, DRNY as the State's P & A System, is the primary organization charged with protecting and advocating for the rights of children and adults with disabilities in the State.  Like DRNY, the public has an interest in ensuring that students funded with public monies are free from abuse and neglect.

**CONCLUSION**

The DD Act, PAIMI Act and PAIR Act "aim to protect the legal and human rights of individuals with developmental disabilities [mental illness and other disabilities]. . . . To this end, the statute provides access to service recipients for both investigatory and monitoring purposes, i.e., to investigate past instances of suspected abuse or neglect and to monitor to ensure current respect for the rights and safety of service recipients. *Connecticut Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d at 241 (internal citations omitted). DRNY is the New York State's Protection and Advocacy system and must be granted the access it seeks to fulfill its investigatory and monitoring purposes. For all the reasons detailed herein, DRNY respectfully requests that this Court grant provide DRNY declaratory and injunctive relief to obtain access to Blue Creek Elementary School.

Respectfully submitted,

By: _____
Julie M. Keegan

DISABILITY RIGHTS NEW YORK

JULIE M. KEEGAN
725 Broadway, Suite 450
Albany, New York 12207
(518) 432-7861
Bar Roll No. 518293

JENNIFER J. MONTHIE
725 Broadway, Suite 450
Albany, New York 12207
(518) 432-7861
Bar Roll No. 512427

CLIFF ZUCKER
725 Broadway, Suite 450
Albany, New York 12207
(518) 432-7861
Bar Roll No. 102871