**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

DISABILITY RIGHTS NEW YORK,

*Plaintiffs,*

-against-

NORTH COLONIE BOARD OF EDUCATION,
North Colonie Central Schools, and
Mr. D. Joseph Corr, in his official capacity as the
Superintendent of North Colonie Central Schools,

*Defendants.*

**Memorandum in Support of**
**Plaintiff's Motion for Summary**
**Judgment**
Docket No:  1:14-cv-00744

**TABLE OF CONTENTS**

INTRODUCTION ……………………………………………………...………..1

UNDISPUTED FACTS ………………………………………………….…….…1

    A. The Federal Protection and Advocacy System ………………….………......1
    B. Defendants' Failure to Provide Access to Facility and Records …………….4

STANDARD FOR SUMMARY JUDGMENT …………………………….…..8

LEGAL ARGUMENT …………………………………………………….…....9

POINT I:  DRNY IS THE PROTECTION AND ADVOCACY SYSTEM
           IN NEW YORK AND IS ENTITLED TO PHYSICAL ACCESS
           TO BLUE CREEK ELEMENTARY SCHOOL ………….……………9

    A. DRNY Received Complaints Alleging Acts of Abuse and Neglect
       as Defined in the DD, PAIMI and PAIR Acts …………………………..….9

        i.    DRNY Received Multiple "Complaints" as Defined by the
            P&A Acts …………………………………………………...……10

        ii.   The Acts and Omissions Alleged in the Complaints Received
            by DRNY Constitute Abuse and Neglect as Defined by the
            P& A Acts ……………………………………………………...…11

    B. Blue Creek Elementary School is a Facility as Defined in the DD,
       PAIMI and PAIR Acts ………………………………………………..15

    C. The Complaints Received by DRNY Pertained to Individuals with
       Disabilities ……………………………………………………………17

    D. DRNY is Equally Entitled to Physical Access of Blue Creek School
       Solely on the Basis of its P&A Monitoring Authority……………….…..19

POINT II:  DEFENDANTS WRONGFULLY DENIED DRNY ACCESS
            TO RECORDS OF INDIVIDUALS WITH DISABILITIES ……….20

CONCLUSION ………………………………….……………………………20

## INTRODUCTION

Disability Rights New York (hereinafter "DRNY"), the designated Protection and Advocacy ("P & A") system  for the State of New York, commenced this action to enforce its federal law rights to access facilities, individuals, and records pursuant to the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. § 10801 et seq., the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 15041 et seq., the Protection and Advocacy for Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e, and New York Executive Law § 558. (Hereafter collectively "P & A Acts").  DRNY received multiple complaints that students with disabilities in the Blue Creek Elementary School ("Blue Creek School") have been and are being subjected to abuse and neglect. DRNY brought this action to challenge the North Colonie Board of Education, North Colonie Central Schools and Superintendent D. Joseph Corr's (collectively "Defendants") refusal to grant DRNY access to Blue Creek Elementary School.  Defendants likewise denied DRNY access to records pertaining to the students with disabilities attending Blue Creek School, causing DRNY to amend its Complaint to gain access to records.  The denial of access by Defendants prevents DRNY from fulfilling the statutory mandates of investigating allegations of abuse and neglect as well as providing protection and advocacy services for individuals with disabilities.

## UNDISPUTED FACTS

A.  The Federal Protection and Advocacy System

In 1975, Congress enacted the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. §§ 6041-6043,[1] following revelations of inhumane and despicable conditions at a

---

[1] Congress subsequently replaced the statute with the Developmental Disabilities Act of 2000 ("DD Act"), 42 U.S.C. §§ 15001-15115.

New York institution for persons with developmental disabilities. *Conn. Office of P&A v. Kirk*, 354 F. Supp. 2d 196, 199 (D. Conn. 2005).  Under the DD Act, in order to receive federal funds, a state must have in effect a protection and advocacy system for persons with disabilities. *Id.* Congress granted the Protection and Advocacy (P&A) System broad authority to "investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 15043(a)(2)(B).

In 1986, Congress passed the Protection and Advocacy for Mentally Ill Individuals Act, 42 U.S.C. §§ 10801-10827, after finding that individuals with mental illness were vulnerable to abuse, neglect, and serious injury, and that state systems for monitoring the rights of these individuals varied widely and were frequently inadequate.  42 U.S.C. § 10801(a);  *Connecticut Office of Prot. & Advocacy for Persons With Disabilities v. Kirk,* 354 F. Supp. 2d 196, 199 (D. Conn. 2005*) aff'd sub nom. Prot. & Advocacy For Persons With Disabilities, Conn. v. Mental Health & Addiction Servs.*, 448 F.3d 119 (2d Cir. 2006).   The PAIMI Act also provided for states to establish a P&A system to protect and advocate for the rights of individuals with mental illness.  42 U.S.C. 10801;  *Kirk*, 354 F. Supp. 2d at 199.

Moreover, Congress found that "[s]tate systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate." 42 U.S.C. § 10801(a)(4). Accordingly, Congress granted P&As the same powers found under the DD Act: the power to "investigate incidents of abuse and neglect of persons with mental illness if the incidents are reported to the system or if there is probable cause to believe that incidents occurred." 42 U.S.C. § 10805(a)(1)(A).

In order to conduct its investigations, both the DD Act and the PAIMI Act provide a P&A with broad authority to access facilities at times when service recipients are present. 42 U.S.C. § 10543(a)(2)(H) and (1), 42 U.S.C. § 10805(a)(3) and (4),42 U.S.C. § 10806,45 C.F.R. § 1386.22,42 C.F.R. § 51.42.

> A system shall have reasonable unaccompanied access to public and private facilities which provide services, supports, and other assistance for individuals with developmental disabilities in the State when necessary to conduct a full investigation of an incident of abuse or neglect under section 142(a)(2)(B) of the [DD] Act. This authority shall include the opportunity: to interview any facility service recipient, employee, or other person, including the person thought to be the victim of such abuse, who might be reasonably believed by the system to have knowledge of the incident under investigation; and to inspect, view and photograph all areas of the facility's premises that might be believed by the system to have been connected with the incident under investigation.

45 C.F.R. § 1386.22(f)[2]

In 1992 Congress enacted the PAIR Act to ensure protection and advocacy services are available to individuals with disabilities that neither have developmental disabilities as defined by the DD Act nor mental illness as defined by PAIMI Act. 29 U.S.C. § 794e (a) (l) (B).  As an example, an individual with a learning disability would be eligible for services under PAIR. Congress granted the P&A under PAIR the authority to investigate incidents of abuse and neglect of individuals with disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred. 42 U.S.C. § 15043(a) (2) (B). 29 U.S.C. § 794e (f); see also, *Connecticut Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 240-241 (2d Cir. 2006).

---

[2] See also *id.* § 1386.22(g) (noting that the system "shall have unaccompanied access to all residents of a facility at reasonable times, which at a minimum shall include normal working hours and visiting hours" for the purposes of fully investigating alleged abuse and neglect).

The P&A Acts also authorize a P&A system to "pursue administrative, legal, and other appropriate remedies" to ensure the protection of the rights of such disabled individuals in New York State. 42 U.S.C. §§ 10805(a)(1)(B) and 15043(a)(2)(A)(i).  To allow a P&A system to pursue these objectives, the Acts authorize a P&A system to have access to records of persons with disabilities under certain circumstances, including with the authorization of the individual's legal representative. 42 U.S.C. §§ 15043(a)(2)(I)(i) and 10805(a)(4)(A). Records requested by a P&A system must be provided promptly, 42 U.S.C. § 15043(a)(2)(J)(i)-(ii); 42 C.F.R. § 51.41(a), and a written explanation must be provided for any delay, 42 C.F.R. § 51.43; 45 C.F.R. § 1386.22(i).

The U.S. Department of Health and Human Services ("HHS") has promulgated regulations governing activities carried out by P&A systems, including P&A systems' access to records.  42 C.F.R. § 51.41 ("PAIMI Access Regulation"); 45 C.F.R. § 1386.22 ("DD Access Regulation," together with the PAIMI Access Regulation, the "P&A Access Regulations"). These Regulations make clear that a P&A system's access authority extends to all locations where care, treatment, services and habilitation are provided to individuals with disabilities. 42 C.F.R. § 51.41(c)(2); 45 C.F.R. § 1386.22(b)(2).

At all times relevant to this action, DRNY has been the statewide P&A system as designated by the Governor of the State of New York.  Declaration of Julie M. Keegan, Esq. in Support of Plaintiff's Motion for Summary Judgment ("Keegan Decl.") Exhibit A.

B. Defendants' Failure to Provide Access to Facility and Records

Pursuant to its authority as New York's P&A system, from April 22, 2014 through June 9, 2014, DRNY received multiple complaints alleging abuse and neglect of students with disabilities placed in the "Academic Skills Class" located at Blue Creek Elementary School in

the North Colonie Central School District ("ASC program"). Keegan Decl. Exhibit B ¶ 11; Exhibit C at 15-32; Exhibit D ¶ 12 – 27.

The complaints received by DRNY included to the following allegations:

i.  District staff repeatedly physically restrained students with disabilities without conducting a functional behavior assessment and developing a behavior intervention plan for such students. Keegan Decl. Exhibit C at 23-24; Exhibit D ¶ 16, 21.

ii.  The District failed to comply with State regulations regarding the use of physical restraints in instances when resistant students were involuntarily "escorted" using physical force.  Keegan Decl. Exhibit C at 29, 30; Exhibit D ¶ 26; Exhibit G 11:9-19.

iii.  At least 80 such "escorts" involved students in the ASC program.  Keegan Decl. Exhibit C at 29-30.

iv.  District employees using physical restraints on students were not trained. Keegan Decl. Exhibit C at 18.

v.  The District failed to provide notice of the use of physical restraint to parents of students with disabilities as required by state law. Keegan Decl. Exhibit C at 30; Exhibit G 112:15-22.

vi.  District staff placed other students with disabilities at risk of harm, injury, abuse or neglect when restraining other students with disabilities. Keegan Decl. Exhibit C at 17-18.

vii.  The District failed to conduct Functional Behavior Assessments and develop Behavior Intervention Plans for ASC students who had a history of significant behaviors at school that impede learning and the learning of others. Keegan Decl. Exhibit C at 19, 23-24; Exhibit D ¶ 16, 21.

viii.   The District failed to supervise students with disabilities in the ASC class which resulted in students eloping from the school building, several hundred feet through a busy parking area and down a well-trafficked public street; Keegan Decl. Exhibit C at 22, 24-25; Exhibit D ¶ 19, 22.

ix.   District administrators designated a bathroom as a "quiet room" for a student with a history of aggressive behaviors.  The bathroom could be locked from inside and contained unsafe fixtures, a toilet and shower and was otherwise an unsafe location for behavioral intervention.  Keegan Decl. Exhibit C at 21-22, 25-28; Exhibit D ¶ 23-24; Exhibit G 105:19-24 – 106:1-3.

x.   ASC students sometimes were relocated to a bathroom to eat lunch or receive instruction when a classmate demonstrated aggressive behavior in the classroom. Keegan Decl. Exhibit C at 18, 25.

xi.   The physical set up of the ASC program was insufficient to provide behavioral interventions required by students in the program resulting in increased aggressive behavior. Keegan Decl. Exhibit C at 21, 27, 28.

xii.   The District failed to provide sufficient staff to address students' needs or in accordance with the students' Individualized Education Programs. C at 18, 23, 27, 28-29.

xiii.   The District permitted program staff to repeatedly verbally and physically harass students in such a manner that students became fearful, agitated, and/or disruptive when interacting with such staff.  Keegan Decl. Exhibit C at 15-16, 17-18, 31-32; Exhibit  D ¶ 12, 27.

xiv.    District administrators failed to respond to complaints and concerns expressed by school employees regarding the safety of the students in the ASC program. Keegan Decl. Exhibit C at 26, 27-29, 32; Exhibit G 113:19-24, 114:1-7.

xv.    A District employee directed a student's guardian to place multiple doses of prescription medication in a student's backpack to be brought by the unaccompanied student to the school where it would be retrieved by school nurse and the nurse failed to retrieve the medication causing the student to transport it back home without knowledge or supervision of any adult.  DRNY Keegan Decl. Exhibit C at 20; Exhibit Ex. D ¶ 17.

xvi.    The District did not take any action to assess a student's suicide risk after the student made two threats of suicide and attempted to choke himself. Keegan Decl. Exhibit C at 24.

These allegations were from six (6) separate complainants who have direct knowledge of the District's educational program, including one individual who had worked at Blue Creek School. Keegan Decl. Exhibit C at 30; Exhibit G 108:2-4,109:2, 111:9-19.

Based on the nature, number and credibility of the complaints received, DRNY sought access to the Defendants' Blue Creek Elementary School and the ACS program.  Keegan Decl. Exhibit D ¶ 28-29; Exhibit G 119:20-24 – 120:1-6, 131:7-14.  On June 12, 2014, DRNY notified the Defendants' of DRNY's investigation and that DRNY would be conducting an investigation at Blue Creek Elementary School on June 17, 2014.  Keegan Decl. Exhibit H.  On June 16, 2014, the District denied DRNY access to Defendants' building and program. Keegan Decl. Exhibit I.

On June 20, 2014, DRNY received a temporary restraining order issued by the Honorable David Hurd restraining Defendants from denying DRNY immediate access to Blue Creek School

when students are present to permit plaintiff to conduct an investigation into allegations of abuse and/or neglect. Keegan Decl. Exhibit J. DRNY's access was limited to 6.5 hours when students were present on the final days of school. Keegan Decl. Exhibit K; Exhibit L.

In a further effort to complete its investigation, DRNY requested from Defendants the records of four students who participated in the ASC program and who were clients of DRNY. Keegan Decl. Exhibit M. Pursuant to federal law, DRNY provided Defendants with a records release signed by the parent or guardian of each of the students. 42 U.S.C. § 15043(a)(2)(I)(i)]; 42 U.S.C. § 10805(a)(4)(A)(1) [PAIMI]. Keegan Decl. Exhibit M. Defendants again refused to recognize DRNY's P&A authority and withheld records. Keegan Decl. Exhibit N. Accordingly, DRNY filed an amended complaint on August 18, 2014 demanding full access to the student records. ECF Doc. No. 24.

As a result of Defendants' ongoing refusal to comply with the federal laws governing the P & A system, DRNY's investigation of the allegations of abuse and neglect remains incomplete. Keegan Decl. Exhibit G 60:3-4, 71:20-24, 80:10-11, 89:23, 97:7-9; 102:9-12; 105: 3-5, 110:14-16, 113:9-12. Moreover, DRNY has been unable to investigate a complaint regarding unlawful physical restraint procedures by staff in another ASC classroom in Blue Creek School. Keegan Keegan Decl. Exhibit G 124:4-11.

## STANDARD FOR SUMMARY JUDGMENT

Summary adjudication is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 492 F.3d 89, 96 (2d Cir.2007). In considering a motion for summary judgment, a court must

examine all the evidence in the light most favorable to the non-moving party, *United States v. Diebold, Inc.*, 369 U.S.654 (1962); *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir.2004), but the moving party may discharge its burden of showing that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325.  This shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The evidence presented by the parties must be admissible. Fed. R. Civ.P. 56(e).  Conclusory, speculative testimony in affidavits and moving papers does not raise genuine issues of fact and defeat a summary judgment motion.  See, *Falls Riverway Realty, Inc. v. City of Niagara Falls*, 754 F.2d 49,57 (2d Cir. 1985).  Summary judgment is appropriate if the evidence favoring the non-moving party is merely colorable or is not significantly probative.  See, *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999).  All these tests favor a grant of summary judgment here, as demonstrated below.

## LEGAL ARGUMENT

### POINT I

### DRNY IS THE PROTECTION AND ADVOCACY SYSTEM IN NEW YORK AND IS ENTITLED TO PHYSICAL ACCESS TO BLUE CREEK ELEMENTARY SCHOOL.

A.    **DRNY Received Complaints Alleging Acts of Abuse and Neglect as Defined in the DD, PAIMI and PAIR Acts.**

Under federal and State law, a Protection and Advocacy System is authorized to fully investigate any complaint reported to the system alleging abuse or neglect occurring in any public or private facility that provides care, services, treatment and/or habilitation to persons with disabilities. 42 U.S.C. § 15043 (a)(2)(B); 45 C.F.R. § 1386.22(f); 42 U.S.C.

§10805(a)(1)(A) and 29 U.S.C. § 794e (f)(2);  NY Executive Law §558(b).  Specifically, a state's P & A system for persons with developmental disabilities "shall have the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system *or* if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 15043(a)(2)(B) (emphasis added).[3]  See, *Hawaii Disability Rights Center v. Cheung*, 2007 WL 2106584 at 5 (D. Hawaii) (To exercise its access authority, a P & A is not required to establish probable cause if it has received a complaint).   Where, as here, one or more complaints of abuse and neglect are reported to the P&A System, the System's access authority is triggered.  See, 42 U.S.C. § 15043(a)(2)(B); . *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr., et. al*, 97 F.3d 492, 498 (11th Cir. 1996) ( a single anonymous telephone call was sufficient for a P & A to undertake an investigation); *Disability Law Center of AK, Inc. v North Star Behavior Health*, 2008 WL 853639 at 2 (D. Alaska) (a single complaint alleging abuse was sufficient for investigation and access); *Hawaii Disability Rights Center v. Cheung*, at 5.

  i. <u>DRNY Received Multiple "Complaints" as Defined by the P&A Acts.</u>

  DRNY received complaints from six complainants alleging that students in Defendants' Blue Creek Elementary School ASC program have been and continue to be subjected to abuse and neglect. Keegan Decl. Exhibit C at 15-32; Exhibit D ¶ 12, 14 – 27.  A [c]omplaint "includes, but is not limited to, any report or communication, whether formal or informal, written or oral, received by the system including media accounts, newspaper articles, telephone calls (including anonymous calls), from any source alleging abuse or neglect of an individual with a

---

[3] Similarly, a state's PAIMI program and its PAIR program have the same authority with respect to their respective service populations. *See respectively,* 42 U.S.C. §10805(a)(1)(A) and 29 U.S.C. § 794e (f)(2).

developmental disability.  45 C.F.R. § 1386.19.[4]  Here, DRNY received complaints from five

parents or guardians of students in the ASC program. Keegan Decl. Exhibit C at 15-32; Exhibit

D ¶ 12-24.  DRNY also conducted a two-hour interview with a sixth complainant who had

worked at Blue Creek School and had direct knowledge of the ASC program and who provided

additional complaints and corroborating facts.   Keegan Decl. Exhibit C at 27-28; Exhibit G

107:17-19, 108:2-4, 109:5, 110:23, 111:9-19.  Defendants do not dispute that DRNY received

these multiple complaints about the ASC program at Blue Creek School.  Keegan Decl. Exhibit

B. ¶ 53-71.

     ii.   <u>The Acts and Omissions Alleged in the Complaints Received by DRNY
Constitute Abuse and Neglect as Defined by the P&A Acts.</u>

The complaints received by DRNY fall squarely within the definitions of abuse and

neglect in the relevant P&A regulations.  Pursuant to the regulations governing the Protection

and Advocacy System for the Rights of Persons with Developmental Disabilities ("PADD"):

> Abuse means any act or failure to act which was performed, or which was failed to be
> performed, knowingly, recklessly, or intentionally, and which caused, or may have
> caused, injury or death to an individual with developmental disabilities, and includes such
> acts as: Verbal, nonverbal, mental and emotional harassment; rape or sexual assault;
> striking; the use of excessive force when placing such an individual in bodily restraints;
> the use of bodily or chemical restraints which is not in compliance with Federal and State
> laws and regulations or any other practice which is likely to cause immediate physical or
> psychological harm or result in long term harm if such practices continue.

45 C.F.R. § 1386.19.

The definition of abuse under PAIMI is nearly identical.[5]

---

[4] Add PAIMI and PAIR cites

[5] Under PAIMI, "[a]buse means any act or failure to act by an employee of a facility rendering care or treatment
which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which
caused, or may have caused, injury or death to an individual with mental illness, and includes but is not limited to
acts such as: rape or sexual assault; striking; the use of excessive force when placing an individual with mental
illness in bodily restraints; the use of bodily or chemical restraints which is not in compliance with Federal and State
laws and regulations; verbal, nonverbal, mental and emotional harassment; and any other practice which is likely to

DRNY received multiple complaints alleging conduct specifically identified as abuse under 45 C.F.R. § 1386.19 including: verbal and nonverbal harassment of students in the ASC class by a staff person (Keegan Decl. Exhibit C at 15-18, 31-32; Exhibit D ¶ 12, 27); the use of bodily restraints in a manner that violates 8 NYCRR 200.22(d), to wit, imposing physical restraints as a substitute for systematic behavioral interventions (Keegan Decl. Exhibit C at 23-24;  Exhibit D ¶ 16, 20, 21), failing to notify parents when physical restraints were imposed (Keegan Decl. Exhibit C at 30; Exhibit G 112:15-22), and permitting untrained staff to conduct physical restraints (Keegan Decl. Exhibit C at 18); failing to prevent student elopement from the school building which placed eloping students at immediate risk of physical harm (Keegan Decl. Exhibit C at 22, 24-25; Exhibit D ¶ 19, 22); designating a physically unsafe bathroom as a place for behavioral de-escalation which placed students using the room at risk of immediate physical harm (Keegan Decl. Exhibit. C at 21-22, 25-28; Exhibit D ¶ 23-24; Exhibit G 105:19-24 – 106:1-3);  and directing a parent to allow a student with a disability to transport prescription medication to school without adult supervision thereby placing the student at immediate risk of physical harm (Keegan Decl. Exhibit C at 20; Exhibit D ¶ 17).

Similarly, complaints reported to DRNY alleged acts which, if found true, would constitute neglect.  Pursuant to the regulations governing PADD:

> Neglect means a negligent act or omission by an individual responsible for providing treatment or habilitation services which caused or may have caused injury or death to an individual with developmental disabilities or which placed an individual with developmental disabilities at risk of injury or death, and includes acts or omissions such as failure to: establish or carry out an appropriate individual program plan or treatment plan (including a discharge plan); provide adequate nutrition, clothing, or health care to an individual with developmental disabilities; provide a safe environment which also includes failure to maintain adequate numbers of trained staff.

---

cause immediate physical or psychological harm or result in long-term harm if such practices continue. 42 C.F.R. § 51.2.

45 C.F.R. § 1386.19.  The definition of neglect under PAIMI is nearly identical.[6]

The complaints received by DRNY included multiple allegations of neglect as defined by the DD Act and PAIMI including: failure to provide a safe classroom environment for students with significant behavioral challenges (Keegan Decl. Exhibit C at 21, 27, 28); the designation and use of an unsafe bathroom for behavioral de-escalation (Keegan Decl. Exhibit C at 21-22, 25-26, 27-28; Exhibit D ¶ 23-24; Exhibit G 105:19-24–106:1-3); failing to have adequate numbers of trained staff to support the students in the ASC program (Keegan Decl. Exhibit C at 18, 23, 27, 28-29) and prevent them from eloping from the building (Keegan Decl. Exhibit C at 22, 24-25; Exhibit D ¶ 19, 22); and failing to secure a suicide assessment of a student who made two threats of suicide (Keegan Decl. Exhibit C at 24).  Each of these complaints of alleged abuse and neglect is alone sufficient to trigger DRNY's access authority.  42 U.S.C. § 15043(a)(2)(B), 42 U.S.C. §10805(a)(1)(A); <u>see also</u>, *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr., et. al*, at 498; *Disability Law Center of AK, Inc. v North Star Behavior Health*, at 2.

Courts have confirmed P&A access authority based on similar and or lesser complaints. in *State of Connecticut Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, the Connecticut P & A System sought access to records and individuals in an educational program operated by the Hartford Board of Education based on complaints that students in the program had been subjected to inappropriate restraint and seclusion and that in certain instances, students suffered injury as a result. 355 F. Supp. 2d 649, 652 (D. Conn.

---

[6] Under PAIMI, "[n]eglect means a negligent act or omission by an individual responsible for providing services in a facility rendering care or treatment which caused or may have caused injury or death to an individual with mental illness or which placed an individual with mental illness at risk of injury or death, and includes, but is not limited to, acts or omissions such as failure to: establish or carry out an appropriate individual program or treatment plan (including a discharge plan); provide adequate nutrition, clothing, or health care; and the failure to provide a safe environment which also includes failure to maintain adequate numbers of appropriately trained staff." 42 C.F.R. § 51.2.

2005), aff'd sub nom. *Connecticut Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.*, *supra.*   The District Court summarily concluded that the allegations reported to the P & A constituted probable cause. *Id.* at 661.   Similarly, in *Disability Law Ctr. of Alaska, Inc. v. Anchorage Sch. Dist.*, the P & A sought access to further its investigation of a class serving students with developmental disabilities in a public elementary school. *Supra* at 939.   The Ninth Circuit Court of Appeals determined that "complaints concerning general problems with classroom conditions and the treatment of students" were sufficient to justify the P & A's access authority. Id.   Indeed, a single complaint alleging hair pulling of a child was a sufficient for a P & A to exercise its access authority. *Disability Law Center of AK, Inc. v. North Star Behavior Health*, 2008 WL 853639 at 2.   "It was perfectly reasonable for the [P & A system] to conclude that the incident reported may have been abuse of a person who is mentally ill.   That is all [the P & A system] needed to investigate and request records from the [the provider] pursuant to 42 U.S.C. § 10805." *Id.*

Accordingly, given the nature, number and specificity of complaints alleging acts and omissions of abuse and neglect reported, DRNY has ample basis and authority to expand its investigation of Blue Creek School to include physical access. Moreover, as courts across jurisdictions have consistently held, a P & A's determination as to the sufficiency of complaints is not subject to challenge by the state or a service provider such as defendants.  See, e.g., *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492, 499 (11th Cir. 1996); *Prot. & Advocacy For Persons With Disabilities v. Armstrong*, 266 F. Supp. 2d 303, 321 (D. Conn. 2003); *Arizona Ctr. for Disability Law v. Allen,* 197 F.R.D. 689, 693 (D.Ariz.2000); *Center For Legal Advocacy v. Earnest,* 188 F.Supp.2d 1251, 1257 (D.Colo.2002), *rev'd on other grounds,* 320 F.3d 1107 (10th Cir.2003); 1257; *Rasmussen, 206*

F.R.D. 630; *Gerard Treatment Programs, L.L.C.,* 152 F.Supp.2d at 1159; *Mt. Washington*

*Pediatric Hospital, Inc.,* 106 Md.App. 55, 664 A.2d 16.

> . . . unlike criminal law probable cause, the consequence of a P&A's determination of probable cause is not an indictment or an accusation, but rather a civil investigation. Moreover, no fundamental liberty or privacy interest is impinged when a P&A finds probable cause to investigate an incident at a facility. In the P & A probable cause process, the interests of three parties are implicated—those of the facility, those of the individual who may have been subject to abuse and his or her family, and those of the P & A, which has an obligation and mandate to protect from abuse the individual(s) and others who are similarly situated. In this balance, the facility's interests surely are less viable and of less import than those of the individual and the P & A. The facility can claim no interest in avoiding investigations of harm or injury to a person with a disability. Minor inconveniences to staff or some disruption of the facility's routine hardly rise to the level of the liberty interest that is generally at issue in a criminal investigation. . . . Indeed, one would suppose that a facility's legitimate interests are served when abuse and neglect are uncovered and can be corrected.

*Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.,* at 499, citing

*Michigan Protection & Advocacy Service, Inc. v. Miller,* 849 F.Supp. 1202, 1208–09

(W.D.Mich.1994); see also, *Prot. & Advocacy For Persons With Disabilities v. Armstrong* at

321.  As in Tarwater and Armstrong, defendants here have no "legitimate interest" in keeping

DRNY from conducting its investigation.

**B.   Blue Creek Elementary School is a Facility as defined in the DD, PAIMI and PAIR Acts.**

Defendants' "Blue Creek Middle School" is a facility within the meaning of the P&A

Acts.  Defendants' program engages in the type of treatment and care within the plain language

of the statutes and regulations.

"A facility includes any setting that provides care, treatment, services and habilitation,

even if only 'as needed' or under a contractual agreement."   45 C.F.R. § 1386.19; see also 42

U.S.C. § 15043(a)(2)(H). Defendants' Blue Creek School is a facility within the plain meaning

of the P & A Acts because it administers treatment and provides services to individuals with

disabilities. Defendants administer a self-contained class for students with a variety of developmental disabilities, mental illness and/or disabilities that impact learning and manifest in significant behavioral challenges at school. Keegan Decl. Exhibit E, Resp. No. 29, 30, 35, 36; Exhibit F, Resp. No. 1, 3. The Defendants conduct functional behavior assessments, provide counseling, behavior intervention plans, Occupational Therapy, Physical Therapy, Speech Therapy, dispense of medication, provide nursing services, and special education related to students' mental health issues. Keegan Decl. Exhibit E, Resp. No. 5.

The Second Circuit firmly settled that a P&A system is authorized to access public, non-residential schools in *Connecticut Office of Prot. & Advocacy for Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 242 (2d Cir. 2006) (a public school educational program for students with disabilities is a facility with the meaning the P&A Acts). In reviewing the definition of "facilities", the Second Circuit, in an opinion by then Court of Appeals Judge Sonya Sotomayor, held the P & A system is entitled to access to "non-residential facilities that provide care or treatment to individuals with [disabilities]." Id. at 239[7]

Similar to the Defendants' school, the public school in *Hartford* was alleged to have used physical restraints and seclusion as a method of to control emotional and behavioral problems related to metal illness. 464 F.3d at 233, 238. Similar to the *Hartford* case, students enrolled in Blue Creek School have been identified as requiring special education or related services under the IDEA. There is no real distinction between the special education program administered by Defendants and the program administered in the program in *Hartford*.

---

[7] In *Hartford* , the 2nd Circuit adopted the position of the Department of Health and Human Services (DHHS) in interpreting DHHS regulations related to the statute. Id. at 239. See also Brief for Amici Curiae the Department of Education and DHHS, 2006 WL 4470911.

Numerous other courts have confirmed that P&A access authority extends to public schools serving students with disabilities. Indeed, the defendants' argument that schools and school districts are not "facilities" within the meaning of the P&A statutes has no credence in any jurisdiction. See, e.g., *Disability Rights Wisconsin v. State of Wisconsin Dep't of Public Instruction*, 463 F.3d 719, 726 (7th Cir. 2006) (holding that "the potential abuse or neglect took place at Lincoln [a school], and Lincoln easily meets the definition of a facility."); *Disability Law Center of Alaska Inc., v. Anchorage School District*, at 940 (upholding the U.S. Department of Health and Human Services' interpretation of the P&A statutes, and holding that schools are covered "facilities"); Protection & Advocacy For Persons With Disabilities v. Armstrong, at 314 ("a facility" was one where treatment of mental illness occurred); Pennsylvania Protection & Advocacy, Inc. v. Houstoun, 228 F.3d 423, 425 (3d Cir. 2000),("a facility" is a place where treatment of mental illness occurs); Center For Legal Advocacy v. Hammons, 323 F.3d 1262, 1268, 1270 (10th Cir. 2003) (P&A has access to all records related to quality assurance and treatment); Missouri Protection & Advocacy Services v. Missouri Dept. of Mental Health, 447 F.3d 1021, 1023-4 (8th Cir. 2006) (allowing access to all records related to the treatment of those with mental illness). It is well settled law that a school (or a school district) is a "facility" within the meaning of the P&A statutes.

**C.   The Complaints Received by DRNY Pertained to Individuals with Disabilities.**

The third and final prerequisite for a P&A's access authority is the P&A's reasonable belief that the victims of alleged abuse and neglect are individuals with disabilities.  Similar to *Hartford*, all the students in the ASC program are students with disabilities as defined by the Individuals with Disabilities Education Act (20 U.S.C. § 1400 *et seq*).  Keegan Decl. Exhibit F, Resp. No. 3.  "All students enrolled at the Academy have been identified as requiring special education or related

services under the IDEA." *Hartford*, at 233.  Disability related classifications of students in the ASC program included autism, emotional disturbance, learning disability, intellectual disability, and other health impairment. Keegan Decl. Exhibit F, Resp. No. 3.  Such disabilities fall squarely within the broad definition of "developmental disability" in the DD Act or are otherwise individuals with disabilities under the PAIR Act. 29 USCA §794e (a) (1).

Moreover, courts have consistently held that "P&A systems need not 'make a threshold showing' of mental illness or developmental disability in order to exercise P&A access authority." *Alabama Disabilities Advocacy Program v. SafetyNet Youthcare, Inc.* 2014 WL 7012710 at *8 (S.D. Alabama 2014), quoting *Armstrong, supra* at 315; see also, *State of Connecticut Office of Protection and Advocacy for Persons with Disabilities v. Hartford Bd. Of Educ.*, *supra* at 655; *J.H. v. Hinds Cnty., Mississippi*, 2011 WL 3047667, at *3 (S.D. Miss. July 25, 2011); *Michigan Prot. & Advocacy Serv., Inc. v. Miller,* 849 F. Supp. 1202, 1207 (W.D. Mich. 1994).  Indeed, courts have recognized that a requirement of such a threshold would frustrate Congressional intent to have independent P&A's investigate abuse and neglect claims on behalf of people with disabilities.  *Armstrong, supra,* 266 F.Supp.2d at 315; *See J.H. Hinds Cty, supra,* WL 2011 at *5 (rejecting defendant's "'Catch 22'" position as "inconsistent with the purpose of the P & A statutes" that [P&A] "lacks sufficient evidence of actual cases of mental illness but denying [P & A] access to residents" to determine whether other cases exist; "reasonable access is allowed to determine whether individuals are covered"); *Kentucky Protection & Advocacy Division v.* Hall, 2001 WL 34792531 at *8 (W.D. Kentucky 2001) ("'[d]emanding a conclusive, individualized showing of developmental disability or mental illness before permitting [access] would reserve to Defendant a gatekeeping function contrary to the specific terms and general purpose of the Acts.'"); *Michigan Protection & Advocacy Service,*

18

*supra* at 1207 ("[the defendant's] present policy of denying [P & A] full access prevents the advocacy organization from bringing in their own mental health professionals to ascertain whether any DSS residents do in fact suffer from mental illness … [and] defeats the very purpose of PAMII … to provide effective protection and advocacy services to the mentally ill).

###### D.    DRNY is Equally Entitled to Physical Access of Blue Creek School Solely on the Basis of Its P & A Monitoring Authority.

In addition to the access authority given to P&A Systems investigate any complaint reported to the system alleging abuse or neglect of persons with disabilities (see,; 45 C.F.R. § 1386.22(f);; 42 C.F.R. § 51.42(b) and 29 U.S.C. § 794e (f)(2);  NY Executive Law §558(b)), a P & A is further authorized to have access to facilities providing care, treatment and services for the purpose of monitoring the facility's compliance with respect to the rights and safety of service recipients. 42 U.S.C. § 15043 (a)(2)(H)45 C.F.R. § 1386.22(g)(2); 42 U.S.C. §10805(a)(3); 42 C.F.R. § 51.42 (c)(2).   A P & A's monitoring authority was specifically recognized by the Second Circuit Court of Appeals in *Hartford*:  "the [DD] statute provides access to service recipients for both investigatory and monitoring purposes . . . the requirement in § 15043(a)(2)(B) that a P & A system have the authority under the [DD] Act to investigate specific incidents does not limit a P & A system to that power alone." *Connecticut Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.*, at 242 (2d Cir. 2006). "This language indicates that Congress intended P&A systems not simply to respond to reports of maltreatment, but also to monitor facilities in order to prevent abuse or neglect. Id.   As in *Harford*, DRNY has an undisputable statutory right to access and monitor a public school program such as Blue Creek School that provides care, treatment and services to individuals with disabilities. See also, *J.H. ex rel. Gray v. Hinds Cnty., Miss.*, 2011 WL 3047667, at *3 (S.D. Miss. July 25, 2011); *Iowa Prot. & Advocacy Servs., Inc. v. Gerard Treatment Programs, L.L.C.*,

152 F. Supp. 2d 1150, 1170 (N.D. Iowa 2001); *Iowa Prot. & Advocacy Servs., Inc. v. Rasmussen,* at 638.

For all of these reasons, it is beyond dispute that DRNY had the requisite legal authority to enter and conduct an investigation in Defendants Blue Creek School.

## POINT II

## DEFENDANTS WRONGFULLY DENIED DRNY ACCESS TO RECORDS OF INDIVIDUALS WITH DISABILITIES

In furtherance of its investigation of the complaints of abuse and neglect at Blue Creek School, DRNY requested records of four students in the ASC program during the 2013-2014 school year. DRNY submitted signed releases from the parents and legal guardians of these students. Keegan Decl. Exhibit M. DRNY's statutory authority is clear:

> [The P&A shall] have access to all records of … any individual with a developmental disability who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access

42 U.S.C. § 15043(a)(2)(I)(i)]; See also 42 U.S.C. § 10805(a)(4)(A)(1) (identical records access authority regarding individuals with mental illness).   Although DRNY stated that each student was a client of our agency and provided written consent of each legal guardian, Defendants refused to provide some of the requested records. Keegan Decl. Exhibit N. Defendants' position is completely without merit given the plain language of the statutes.  DRNY is lawfully entitled to the requested records.

## CONCLUSION

The DD Act, PAIMI Act and PAIR Act "aim to protect the legal and human rights of individuals with developmental disabilities [mental illness and other disabilities]. . . . To this end,

the statute provides access to service recipients and their records for both investigatory and monitoring purposes, i.e., to investigate past instances of suspected abuse or neglect and to monitor to ensure current respect for the rights and safety of service recipients." *Connecticut Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, at 241 (internal citations omitted).  DRNY is the New York State's Protection and Advocacy system and must be granted the access it seeks to fulfill its investigatory and monitoring purposes.  For all the reasons detailed herein, DRNY respectfully requests that this Court grant DRNY summary judgment and declaratory and permanent injunctive relief granting DRNY access to Blue Creek Elementary School and the records of individuals with disabilities therein.

Respectfully submitted,

By: _____
Julie M. Keegan

DISABILITY RIGHTS NEW YORK

JULIE M. KEEGAN
Bar Roll No. 518293

JENNIFER J. MONTHIE
Bar Roll No. 512427

CLIFF ZUCKER
Bar Roll No. 102871

May 14, 2015

725 Broadway, Suite 450
Albany, New York 12207
(518) 432-7861