UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
DISABILITY RIGHTS NEW YORK,

                                    Plaintiff,

        -v-                                          1:14-CV-0744
                                                     (DNH/DJS)

NORTH COLONIE BOARD OF EDUCATION;
NORTH COLONIE CENTRAL SCHOOLS;
and MR. D. JOSEPH CORR, in his official
capacity as the Superintendent of North Colonie
Central Schools,

                                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
APPEARANCES:                        OF COUNSEL:

DISABILITY RIGHTS NEW YORK          JULIE MICHAELS KEEGAN, ESQ.
Attorneys for Plaintiff             JENNIFER J. MONTHIE, ESQ.
725 Broadway, Suite 450             CLIFF ZUCKER, ESQ.
Albany, NY 12207

YOUNG/SOMMER LLC                    JOSEPH F. CASTIGLIONE, ESQ.
Attorneys for Defendants            JESSICA R. VIGARS, ESQ.
Executive Woods
Five Palisades Drive
Albany, NY 12205

RICHARD S. HARTUNIAN                THOMAS SPINA, ESQ.
United States Attorney's Office     SARAH HINGER, ESQ.
445 Broadway
Albany, NY 12207

DAVID N. HURD
United States District Judge

## MEMORANDUM, DECISION and ORDER

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

II. FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B. The Standards for Declaratory Relief and for a Permanent Injunction . . . . . . . . 5

C. Relevant Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

D. Entitlement to Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

    1. Blue Creek is a "facility" or "service provider" under the P&A Statutes. . . 9

    2. The complaints received do allege "abuse" or "neglect" as defined
       by the P&A Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

    3. The ASC classroom students constitute disabled individuals under the P&A
       Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    4. Monitoring Authority pursuant to the P&A Statutes . . . . . . . . . . . . . . . . . .18

    5. Degree of Further Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

## I. <u>INTRODUCTION</u>

Presently under consideration are two motions for summary judgment, the first by plaintiff Disability Rights New York ("Disability Rights"), a New York not-for-profit organization and the second by defendants North Colonie Board of Education, North Colonie Central Schools and Mr. D. Joseph Corr, Superintendent (collectively, the "District"). Both parties have filed papers in response to the opposing party's motion. The United States has also filed a Statement of Interest in this case in support of plaintiff Disability Rights. Oral arguments were heard on October 9, 2015.

## II. <u>FACTUAL BACKGROUND</u>

The following facts are gleaned from the parties' submissions, including the statements submitted pursuant to Northern District Local Rule 7.1.

Disability Rights is the New York Protection and Advocacy system designated by the

2

Governor of the State of New York to provide protection and advocacy services to individuals with mental illness and disabilities pursuant to New York Executive Law § 558. Plaintiff alleges that between April 2014 and June 2014, it received six separate complaints concerning conduct at Blue Creek Elementary School ("Blue Creek"), a school within the defendants' district. Specifically, Disability Rights received information that within Blue Creek's "Academic Skills Class" for fourth, fifth and sixth graders (the "ASC classroom"), there may have been instances of abuse and/or neglect, including, among other things, inappropriate use of physical restraints and seclusion of students. These complaints came from five parents or guardians of students educated in the ASC classroom and one former employee of Blue Creek who worked in the ASC classroom.

During the 2013-2014 school year, the ASC classroom contained a total of 6 or 7 students over the course of the year. Each student was placed in the ASC classroom by the District pursuant to the student's individualized education program ("IEP") and the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"). The students placed in the ASC classroom during the 2013-2014 school year had the following disability classifications pursuant to the IDEA: autism, emotional disturbance, learning disability, intellectual disability and other health impairment. The students placed in the ASC classroom during the 2013-2014 school year were provided assistive technology, counseling, music therapy, occupational therapy, physical therapy and speech and language therapy.

Disability Rights deemed the received complaints credible and as a result, on June 12, 2014, sent defendant Superintendent Corr a letter requesting access to the ASC classroom on June 17, 2014 pursuant to its status as a Protection & Advocacy system (a "P&A system") under (I) the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §

3

10801-10827 (the "PAIMI Act"), (ii) the Developmental Disabilities and Bill of Rights Act, 42

U.S.C. § 15041 *et seq.* (the "DD Act") and (iii) the Protection and Advocacy for Individual

Rights Act, 29 U.S.C. § 794e, *et seq.* (the "PAIR Act", and together with the PAIMI Act and

DD Act, the "P&A Statutes").  By letter dated June 16, 2014, the District denied Disability

Rights physical access to the Blue Creek school.  Based on this denial, Disability Rights filed

suit on June 19, 2014 seeking a declaratory judgment and injunctive relief.  On June 20, 2014,

this Court granted Disability Right's motion for a temporary restraining order seeking to

provide plaintiff with immediate access to the Blue Creek school.  Disability Rights was able

to access the school for approximately 6.5 hours of June 24 and June 25, 2014.  Plaintiff

further had access to Blue Creek for approximately one hour on June 26, 2014 when students

were not present.    In June 2014, Disability Rights also requested that the District produce

the records of four students who participated in the ASC classroom during the 2013-2014

school year for the period from January 1, 2012 onward.  As a result, Disability Rights

provided the District with a records release signed by the parent or guardian of each student.

The District claims to have produced all responsive educational records requested by

Disability Rights as if the plaintiff were the authorized agent of each child, retaining only

internal email correspondence between District employees.

## III. DISCUSSION

(A) *Summary Judgment Standard*.

Summary judgment is appropriate where, construing the evidence in the light most

favorable to the non-moving party, "there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law".  FED. R. CIV. PRO. 56(c);

Richardson v. Selky, 5 F.3d 616, 621 (2d Cir. 1993).  The party moving for summary judgment

has the burden to establish "'that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law.'" Bowen v. National R.R. Passenger Corp., 363 F. Supp. 2d 370, 373 (N.D.N.Y. 2005) (quoting Rodriquez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995)).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A party opposing summary judgment "'may not rest upon mere allegation or denials of [their] pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" Id. (quoting First Nat'l Bank of Ariz. v. Cities Svcs.Co., 391 U.S. 253, 288 (1968)). Those specific facts must be supported by "citing to particular parts of materials in the record." FED. R. CIV. PRO. 56(c)(1)(A). "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249.

*(B) The Standards for Declaratory Relief and for a Permanent Injunction.*

Disability Rights seeks declaratory relief pursuant to 28 U.S.C. § 2201, whereby "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "[A] court must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Continental Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734 (2d Cir.1992) (citing Broadview Chem. Corp. v. Loctite Corp., 417 F.2d 998, 1001 (2d Cir.1969)).

Disability Rights also seeks a permanent injunction. "Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." New York State Nat. Organization for Women v. Terry, 886 F.2d 1339, 1362 (2d Cir.1989). In addition, the plaintiff must demonstrate actual success on the merits rather than a likelihood of success, as is required when a preliminary injunction is requested. Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 546 n. 12 (1987).

*(C) Relevant Statutes*.

The DD Act provides for federal funding of state systems "to protect the legal and human rights of individuals with developmental disabilities....." 42 U.S.C. §§ 15041; 15042. In order to qualify for such funds, a state must have in place a system that is authorized to provide effective advocacy for and protection of the rights of developmentally disabled persons. 42 U.S.C. § 15043(a)(2)(A). Further, such systems must "have access at reasonable times to any individual with a developmental disability in a location in which services, supports, and other assistance are provided to such an individual" as well as access to records of developmentally disabled individuals when certain factors arise. See 42 U.S.C. § 15043(a)(2)(H)—(I). The P&A system shall "investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 15043(a)(2)(B). Effective August 26, 2015, the U.S. Department of Health and Human Services issued new regulations to the DD Act governing activities carried out by the P&A systems. See 45 C.F.R. Part 1386, Subpart C.

Pursuant to the DD Act, the investigative authority of the P&A system includes the ability to inspect, view and photograph all areas of the facility's premises that might be

believed by the system to have been connected with the incident under investigation. 45 C.F.R. § 1386.27(b)(2). See also Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr., 97 F.3d 492, 497 (11th Cir.1996) ("It is clear that [the DD] Act provides express authority for P&As to gain broad access to records, facilities, and residents to ensure that the Act's mandates can be effectively pursued.").

In 1986, the PAIMI Act was passed, which also provided for states to establish a protection and advocacy system to protect and advocate for the rights of individuals with mental illness. See 42 U.S.C. § 10801-10807. Similar to the DD Act, the PAIMI Act grants P&A systems the power to "investigate incidents of abuse and neglect of persons with mental illness if the incidents are reported to the system or if there is probable cause to believe that incidents occurred." 42 U.S.C. § 10803(2). Such P&A systems are authorized to "investigate incidents of abuse and neglect of individuals with mental illness" and "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the state." 42 U.S.C. § 10805(a)(1)(A)-(B). Such P&A systems also must "have access to facilities in the State providing care or treatment." 42 U.S.C. § 10805(a)(3).

The PAIR Act was enacted to ensure protection and advocacy services are available to individuals with disabilities not covered by the DD Act or the PAIMI Act and provides similar investigative powers to the P&A systems. See 42 U.S.C. § 15043(a)(2)(B); 29 U.S.C. § 794e(f). In order to receive federal funds under the PAIR Act, a state must "have in effect a system to protect and advocate the rights of individuals with disabilities" and such system must "have the same general authorities, including access to records and program income, as are set forth" in the DD Act. See 29 U.S.C. § 794e(f)(1)-(2). Thus, while PAIR applies to

a broader segment of the population of individuals with disabilities, it allows the P&A systems the same breadth of investigative and advocacy authority allowed under the DD Act.

To allow a P&A system to pursue these objectives, the P&A Statutes authorize a P&A system to have access to records of persons with disabilities under certain circumstances, including with the authorization of the individual's legal representative.  See 42 U.S.C. § 15043(a)(2)(I) and § 10805(a)(4)(A).  Records requested by a P&A system must be provided promptly, 42 U.S.C. § 15403(a)(2)(J)(i)-(ii); 42 C.F.R. § 51.41(a), and a written explanation must be provided for any delays, 42 C.F.R. § 51.43; 45 C.F.R. § 1386.26.  Further, in the absence of a complaint of abuse and/or neglect, a P&A system is authorized to have access to facilities providing care, treatment and services for the purpose of monitoring the facility's compliance with respect to the rights and safety of service recipients.  See 42 U.S.C. § 15043(a)(2)(H); 42 U.S.C. § 10805(a)(3).

(*D*) *Entitlement to Summary Judgment*.

Disability Rights argues that it is entitled to summary judgment because between April 2014 and June 2014: (i) it received multiple complaints from parents, guardians and a former employee concerning practices and conduct in the ASC classroom, (ii) that the alleged acts and omissions in the complaints received by Disability Rights constituted probable cause to believe that abuse and neglect may have occurred or be occurring in the ASC classroom, (iii) that Blue Creek is a facility as defined by the P&A Statutes, and (iv) the complaints received pertained to individuals with mental illness or disabilities.  See ECF No. 52-17.

The District has raised numerous arguments which it believes preclude an award of summary judgment in favor of Disability Rights and require judgment in its favor.  These include that: (a) the District is not a "facility" pursuant to the P&A Statutes, (b) the alleged

incidents reported to Disability Rights do not constitute incidents of "abuse" or "neglect" as defined by the P&A Statutes which would permit Disability Rights to initiate an investigation and invoke their statutory access and record rights and (c) that the students in question are not individuals with "developmental disabilities", "mental illness" or "disabilities" as defined in the P&A Statutes.

*(1) <u>Blue Creek is a "facility" or "service provider" under the P&A Statutes</u>.*

The District argues that its ASC classroom or its school in general should not be considered a facility or service provider within the meaning of the P&A Statutes. It points to the legislative history of the P&A Statutes which its believes support the conclusion that Congress only meant the statutes to apply to residential facilities housing and/or treating disabled individuals. <u>See</u> Def.'s Mem. Opp'n Summ. J., ECF No. 82, at 18. Further, it notes that New York already has an extensive scheme in place for preventing, reporting and monitoring allegations of abuse and neglect in public schools. <u>Id</u>.

The DD Act provides that a P&A system shall "have access at reasonable times to any individual with a developmental disability in a location in which services, supports, and other assistance are provided to such an individual, in order to carry out the purpose of this part." 42 U.S.C. § 15043(a)(2)(H). The PAIR Act incorporates these provisions of the DD Act. <u>See</u> 29 U.S.C. § 794e(f) (providing that a P&A system has the same authority under the PAIR Act as under the DD Act for individuals who are disabled but neither have mental illness within the meaning of the PAIMI Act nor developmental disabilities within the meaning of the DD Act).

Prior to the regulatory change effective on August 26, 2015, the regulations governing the DD Act defined a "location" as a facility and states that "[a] facility includes any setting that

9

provides care, treatment, services and habilitation, even if only 'as needed' or under a contractual agreement." 45 C.F.R. § 1386.19; 42 U.S.C. § 15043(a)(2)(H). The regulation was modified to remove the "facility" definition and provide P&A systems access to "service providers". See 45 C.F.R. § 1386.27. The regulations do not provide a definition of "service provider". The regulatory body, the Administration on Intellectual and Developmental Disabilities ("AIDD"), states that the absence of such definition was "due to the rapidly changing nature of who provides services, and the tremendous variation in the delivery of supports in a broad range of settings." Id.

Pursuant to the PAIMI Act, a P&A system has authority to access "facilities in the State providing care or treatment" to individuals with mental illness. 42 U.S.C. § 10805(3). Such access authority encompasses both residential and non-residential facilities. Id. The access rights granted to a P&A system apply to a broad range of care or treatment, including "services provided to prevent, identify, reduce or stabilize mental illness or emotional impairment such as mental health screening, evaluation, counseling, biomedical, behavioral and psychotherapies, supportive or other adjunctive therapies, medication supervision, special education and rehabilitation." 42 C.F.R. § 51.2.

The District's argument that Blue Creek should not fall within the definition of a facility or service provider under the P&A Statutes is unpersuasive. "The simple fact that [facilities] are primarily concerned with education and rehabilitation does not prevent them from falling under the auspices of [the P&A Statutes]." Michigan Protection & Advocacy Service, Inc. v. Miller, 849 F. Supp. 1202, 1207 (W.D. Mich. 1994). In Connecticut Office of Prot. & Advocacy for Persons With Disabilities v. Hartford Bd. of Education, 464 F.3d 229, 239-40 (2d Cir. 2006), the Second Circuit found that the Hartford Transitional Learning Academy, a non-

residential, therapeutic public school for students who are seriously emotionally disturbed, was subject to an abuse and neglect investigation by the Connecticut Protection & Advocacy system. The Circuit Court concluded that "to the extent that the [school] is a location that provides care or treatment to individuals with disabilities within the meaning of PAIR and the DD Act, [the P&A system] is authorized to have reasonable access to the [school] and its students during school hours both to investigate specific allegations and to monitor whether the school is respecting students' rights and safety." Id. at 242. In addition to the Second Circuit, other courts have also found that schools providing special education services constitute facilities or service providers under the P&A Statutes. See Disability Law Ctr. of Alaska, Inc. v. Anchorage Sch. Dist., 581 F.3d 936, 939-40 (9th Cir. 2009) (P&A system obtained access to intensive special needs education class at school under the PAIMI Act and the DD Act); Disability Rights Wis., Inc. v. Wis. Dep't of Pub. Instruction, 463 F.3d 719, 726 (7th Cir. 2006) (school providing special education program "easily meets the definition of a facility" providing care and treatment under the DD Act).

The District attempts to distinguish the Hartford decision by highlighting that all students at the Hartford Academy suffered from a disability, while only the ASC classroom at Blue Creek contained disabled individuals. However, this distinction is unpersuasive. Schools frequently provide a variety of forms of care and treatment, including "special education and rehabilitation", as well as "mental health screening, evaluation, counseling, biomedical, behavioral and psychotherapies, supportive or other adjunctive therapies and medication supervision." 42 C.F.R. § 51.2. Blue Creek administered a self-contained class for students with disabilities and behavioral needs and provided services to such students including conducting functional behavior assessments, providing counseling, behavior intervention

plans, occupational therapy, physical therapy, speech therapy, dispensing medication and administering special education. These are the types of services, care and treatment contemplated by the P&A Statutes.

While the investigation and access rights granted to Disability Rights pursuant to the P&A Statutes would not allow it to investigate Blue Creek generally or with respect to students who are not mentally ill or disabled, its educational setting does not preclude it from investigation by a P&A system when the criteria of the P&A Statutes have been satisfied. Adopting the District's logic would permit a school such as the Hartford Academy to remove itself from the investigative powers of a P&A System by having some, or a majority of its classrooms, be general education classrooms. This is counter to the Congressional intent of the P&A Statutes. The purpose of the P&A systems is to monitor the care of and advocate on behalf of individuals with mental illness and developmental or other disabilities. See 29 U.S.C. § 794e(a)(1) (f); 42 U.S.C. §§ 10801, 15001. The P&A system was designed to ensure that individuals with disabilities, some of the most vulnerable members of society, have access to independent advocates and are protected from abuse and neglect wherever they receive services, care or treatment. As schools play an important role in providing care to children with disabilities, they also raise the possibility of abuse and neglect. As a result, the Court finds that the services provided to students in the ASC classroom constitute "care and treatment" as defined in the PAIMI Act and "services" as defined in the DD Act and the PAIR Act.

Therefore, the ASC classroom and other locations utilized by students with mental illness or a disabilities are locations subject to the investigative powers of Disability Rights, the New York designated P&A system.

*(2) The complaints received do allege "abuse" and "neglect" as defined by the P&A Statutes.*

The District alternatively argues that the complaints received by Disability Rights were not "abuse" or "neglect" sufficient to trigger Disability Rights' statutory investigative powers. The relevant regulations enacted pursuant to the DD Act explicitly define "abuse" as: "any act or failure to act which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to an individual with developmental disabilities[.]" See 45 C.F.R. § 1386.19.[1] The regulations then identify certain acts as examples, which include the following: "Verbal, nonverbal, mental and emotional harassment; rape or sexual assault; striking; the use of excessive force when placing such an individual in bodily restraints; the use of bodily or chemical restraints which is not in compliance with Federal and State laws and regulations or any other practice which is likely to cause immediate physical or psychological harm or result in long term harm is such practices continue." Id.

Relative to the term "neglect", neglect is specifically defined for purposes of the DD Act as: "a negligent act or omission . . . which caused or may have caused injury or death to an individual with developmental disabilities or which placed an individual with developmental disabilities at risk of injury or death[.]" See 45 C.F.R. § 1386.19.[2] The regulations then identify certain acts as examples, which include "acts or omissions such as failure to: establish or carry out an appropriate individual program plan or treatment plan (including a discharge

---

[1] The regulatory definition of "abuse" under PAIMI mirrors the listed examples provided under the DD Act and the statutory definitions in these two statutes are, essentially, the same in terms of examples of "abuse". See 42 U.S.C. § 10802(1)(A)-(D) (PAIMI); see also 42 C.F.R. § 51.2.

[2] "Neglect" is defined similarly by PAIMI. See 42 U.S.C. §10802(5). See also 42 C.F.R. § 51.2.

plan); provide adequate nutrition, clothing, or health care to an individual with developmental disabilities; provide a safe environment which also includes failure to maintain adequate numbers of trained staff." Id.

The District posits that the qualifying language of "injury or death" should be applied to every potential example of abuse or neglect. They then further argue that since none of the plaintiff's alleged occurrences of abuse or neglect[3] resulted in actual injury or death, such

---

[3] Disability Rights alleges the following incidents of abuse and neglect:

(a) District staff repeatedly physically restrained students with disabilities without conducting a functional behavior assessment and developing a behavior intervention plan for such students.
(b) The District failed to comply with State regulations regarding the use of physical restraints in instances when restrained students were involuntary "escorted" using physical force.
(c) At least 80 such "escorts" involved students in the ASC classroom.
(d) District employees imposing physical restraints lacked the training required by state laws.
(e) The District failed to provide notice of the use of physical restraint to parents of students with disabilities as required by state law.
(f) District staff placed other students with disabilities who are present when a student is improperly restrained at risk of harm or injury and at risk of abuse and neglect.
(g) The District failed to conduct Functional Behavior Assessments and develop Behavior Intervention Plans for ASC students who had a history of significant behaviors at school that impede learning and the learning of others.
(h) The District failed to supervise students with disabilities in the ASC classroom which resulted in students eloping from the school building and several hundred feet through a busy parking area and down an well-trafficked public street.
(i) District administrators designated a bathroom as a "quiet room" for a student with a history of aggressive behaviors. Said bathroom could be locked from inside and contained unsafe fixtures, a toilet and shower and was otherwise an unsafe location for behavioral intervention.
(j) ASC students sometimes were relocated to said bathroom to eat lunch or receive instruction when a classmate demonstrated aggressive behavior in the classroom.
(k) The physical set up of the ASC program was insufficient to provide behavioral interventions required by students in the program resulting in increased aggressive behavior.
(l) The District failed to provide sufficient staff to address students' needs or in accordance with the students' Individualized Education Programs.
(m) The District permitted program staff to repeatedly verbally and physically harass students in such a manner that students became fearful, agitated, and/or disruptive when interacting with such staff.
(n) District administrators failed to respond to complaints and concerns expressed by school employees regarding the safety of the students in the ASC classroom.
(o) A District employee directed a student's guardian to place multiple doses of prescription medication in a student's backpack to be brought by the unaccompanied student to the school where it would be retrieved by a school nurse and the nurse failed to retrieve the medication causing the student to transport it back home without knowledge or supervision of any adult.
(p) On June 2, 2014, a student in the ASC classroom made two threats of suicide and attempted to choke himself; the guardian was notified but the complainant did not believe any action was taken by the District to formally assess the student's suicide risk.

See Amended Complaint, ECF No. 22, at ¶ 20.

occurrences may not be considered as a triggering event for investigative review by the P&A system.

However, this argument is strained. Each statute provides that the action caused "or may have caused" injury or death to a person with a mental illness or disability. While some of the allegations made by Disability Rights are non-specific, it is certainly reasonable for Disability Rights to conclude that some of the allegations, for example, permitting students to elope outside the building or failing to properly respond to a suicide threat, "may have caused" injury or death. Further, under regulations promulgated pursuant to the PAIMI Act and the DD Act, the use of excessive force when placing an individual in physical restraints is considered to be abuse. See 42 C.F.R. § 51.2; 45 C.F.R. § 1386.19, see also Hartford, 464 F.3d at 233 (alleged abuse consisted of inappropriate use of physical restraints and seclusion of students at the Hartford Academy), Disability Rights Wisconsin, Inc., 463 F.3d at 722 (alleged abuse concerned improper use of seclusion rooms in special education classroom). While the District factually disputes some of the allegations, i.e. that employees were not trained in the use of restraints, Disability Rights had credible information from five parents or guardians and one former employee supporting its access rights for an investigation pursuant to the P&A Statutes.

Therefore, the complaints received by plaintiff constituted allegations of abuse and neglect as defined by the P&A Statutes to support an investigations of the ASC classroom.

(3) *The ASC classroom students constitute disabled individuals under the P&A Statutes*.

Lastly, the District argues that Disability Rights failed to show the students in the ASC

classroom were individuals with a "developmental disability", "disability", or "mental illness" under the P&A Statutes. <u>See</u> ECF No. 82 at 31-32. Students were placed in the ASC classroom as a result of a "student with a disability" finding pursuant to New York State Education Regulations and the IDEA and the District argues that these do not automatically fall within the strictures of the P&A Statutes' definitions.

Under the DD Act, "developmental disability" means a "severe, chronic disability" and "results in functional limitations" in three or more major life activities, which include: (I) self-care, (ii) receptive and expressive language, (iii) learning, (iv) mobility, (v) self-direction, (vi) capacity for independent living, and (vii) economic self-sufficiency." 42 U.S.C. § 15002(8)(A)(iv)(I)-(VII). Pursuant to the PAIMI Act, an "individual with mental illness" includes an individual who has a "significant mental illness or emotional impairment, as determined by a mental health professional." 42 U.S.C. § 10802(4)(A). The PAIR Act does not define disability but notes that the purpose of the Act is to protect the legal and human rights of individuals with disabilities who are ineligible for protection under the DD Act or the PAIMI Act. <u>See</u> 29 U.S.C. § 794e. A disability is defined in Title 42 of the United States Code as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102. However, courts have held that "P&A systems need not 'make a threshold showing' of mental illness or developmental disability in order to exercise P&A access authority." <u>Alabama Disabilities Advocacy Program v. SafetyNet Youthcare, Inc.</u>, 2014 WL 7012710 at *8 (S.D. Alabama 2014). <u>See also</u> <u>Kentucky Protection & Advocacy Division v. Hall</u>, 2001 WL 34792531 at *8 (W.D. Kentucky Sept. 24, 2001) ("[d]emanding a conclusive, individualized showing of developmental disability or mental illness before permitting [access] would reserve to defendant a gatekeeping function contrary to the specific

terms and general purpose of the Acts."). A denial of access on the grounds that a P&A system has not made a conclusive showing the subject individuals are individuals with mental illness or developmentally disabled "prevents [the P&A system] from bringing in their own mental health professionals to ascertain whether any [students] do in fact suffer from mental illness. Such conduct ... defeats the very purpose of [the PAIMI Act] and the DD Act to provide effective protection and advocacy services to mentally ill and developmentally disabled persons." Michigan Protection and Advocacy Service v. Miller, 849 F. Supp. 1202, 1207 (W.D. Mich. 1994). Instead, courts have held that a showing of "substantial evidence" may suffice in order for the P&A system to fulfill their statutory mandate that the subject individuals have a mental illness or disability. See id. at 1207.

In the present case, the conditions affecting certain students attending the ASC classroom included autism, emotional disturbance, learning disability and intellectual disability, as classified pursuant to the IDEA. See ECF No. 75, at ¶ 9. Pursuant to the IDEA, placement of students with disabilities in "special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of the child is such that education in regular classes with the use of supplementary aids and services cannot be satisfactorily achieved." 20 U.S.C. § 1412(a)(5). While such disabilities may not on their face meet the definition of mental illness for purposes of the PAIMI Act, there is substantial evidence that such conditions meet the requirement of a developmental disability under the DD Act or a disability under the PAIR Act. The IDEA classifications of the students contained in the ASC classroom allows an inference that such students fall under the protection of either the DD Act or the PAIR Act, both of which provide Disability Rights with identical investigative powers.

Therefore, plaintiff has demonstrated that the students in the ASC classroom have a developmental disability or disability sufficient to authorize an investigation of incidents of alleged abuse or neglect pursuant to the DD Act or the PAIR Act.

(4) *Monitoring Authority pursuant to P&A Statutes.*

Disability Rights alternatively argues that in addition to its investigative access authority, the P&A Statutes also permit a P&A system access to facilities or service providers for the purpose of monitoring compliance with federal law and that such authority could be used to access the Blue Creek school. See 42 U.S.C. § 15043(a)(2)(H), 45 C.F.R. 1386.22(g)(2). See also Hartford, 464 F.3d at 242 ("Congress intended P&A systems not simply to respond to reports of maltreatment, but also monitor facilities in order to prevent abuse or neglect."). The District argues that plaintiff failed to demonstrate that it has complied the requirements of 42 C.F.R. § 51.42 by informing the parents of students in the ASC classroom prior to physically accessing Blue Creek. Specifically, regulations under the PAIMI Act set forth that "[t]he system shall make every effort to ensure that the parents of minors or guardians of individuals in the care of the facility are informed that the system will be monitoring activities at the facility and may in the course of such monitoring have access to the minor or adult with a legal guardian." See 42 C.F.R. § 51.42(e).

The P&A Statutes charge P&A systems to be responsible for "monitoring compliance with respect to the rights and safety of individuals with developmental disabilities." 45 C.F.R. § 1386.27(c)(2)(ii); see also 42 C.F.R. § 51.42(c)(2). A P&A system's monitoring authority includes "[i]nspecting, viewing, photographing and video recording all areas of a service provider's premises . . . which are used by individuals with developmental disabilities or are accessible to them." 45 C.F.R. § 1386.27(c)(2)(iii) ; see also 42 C.F.R. § 51.42(c)(3). Such

monitoring authority is separate and distinct from a P&A system's responsibility to investigate allegations of abuse or neglect and does not include certain powers a P&A system has when investigating a complaint of abuse or neglect, including the right interview recipients of services, employees and other relevant witnesses and to access records maintained by the service provider.  See 45 C.F.R. §§ 1386.25(a)(2); 1386.27(b); 42 C.F.R. § 51.42(b)

As the plaintiff relied on its investigative access and record rights pursuant to the P&A Statutes when seeking access to the Blue Creek school in 2014 and did not raise its monitoring authority until filing its amended complaint, such authority is not pertinent to the 2014 investigation of the ASC classroom.  However, as the Blue Creek school is a facility or service provider pursuant to the P&A Statutes, Disability Rights may exercise such monitoring authority over the ASC classroom and other locations utilized by disabled individuals in the future provided that Disability Rights otherwise complies with the requirements of the P&A Statutes.

(5) *Degree of Further Compliance*.

Pursuant to the June 20, 2014 order, Disability Rights was provided with physical access to Blue Creek Elementary School in order to investigate the complaints received in April, May and June 2014.  Plaintiff has failed to  demonstrate that any additional access is needed to complete its investigation into the received complaints.  Further, the District has stated that all student records requested in June 2014 have been provided, totaling approximately 805 pages, including records and/or reports relating to the use of restraints and escorts, student disciplinary records and all educational records.  As a result, no further relief will be granted to plaintiff concerning its June 2014 investigation.  The District has provided both physical access to the Blue Creek school and significant educational records requested

by Disability Rights.  Disability Rights has failed to demonstrate that any additional records are necessary to complete its investigation.

However, some injunctive relief is appropriate in the present case to fulfill the Congressional intent of the P&A Statutes.  To require Disability Rights to always obtain a court order to perform its statutory investigative responsibilities would stifle its mission to provide timely and effective advocacy for those it is charged with protecting.  As a result, the District will be enjoined from disputing that: (i) Blue Creek is a "service provider" or "facility" for purposes of the P&A Statutes to the extent Disability Rights seeks to assert rights granted to it pursuant to the P&A Statutes and (ii) that those students receiving special education pursuant to an IDEA designation of a "student with a disability" constitute disabled individuals pursuant to the P&A Statutes.  Disability Rights will however be required to demonstrate to the District or, if necessary, to a Court, that it: (i) has received reports or complaints of abuse or neglect or that there is probable cause to believe that an incident of abuse or neglect has occurred, (ii) that the area to be accessed is used by individuals with mental illness or disability, and (iii) that it has otherwise complied with the requirements of the P&A Statutes before asserting its investigative access and records powers against the District.

## IV. <u>CONCLUSION</u>

For the reasons discussed above, the District's initial refusal to provide Disability Rights with physical access to the ASC classroom at the Blue Creek school when students are present and to provide Disability Rights with requested records concerning the alleged abuse and neglect violated the P&A Statutes.  However, as defendants have subsequently provided adequate access to the ASC classroom and significant records to the plaintiff, plaintiff's request for a permanent injunction will only be partially granted.

Therefore, it is ORDERED that:

1.  Plaintiff's motion for summary judgment is **GRANTED** in part and **DENIED** in part;

2.  Plaintiff's request for a declaratory judgment is **GRANTED** in part.  Blue Creek Elementary School is a facility or service provider pursuant to the provisions of the P&A Statutes; the compl5ints received by Disability Rights do allege abuse or neglect as defined by the P&A Statutes; the ASC classroom students constitute disabled individuals under the P&A Statutes; and that defendants' initial failure to provide physical access to the ASC classroom in Blue Creek Elementary School and the records of individual students educated in the ASC classroom constituted a violation of the P&A Statutes;

3.  Plaintiff's request for preliminary and permanent injunctive relief is **GRANTED** in part.  The District shall be enjoined from disputing that: (i) Blue Creek is a "service provider" or "facility" for purposes of the P&A Statutes to the extent Disability Rights seeks to assert rights granted to it pursuant to the P&A Statutes and (ii) that students receiving special education pursuant to an IDEA designation of a "student with a disability" constitute disabled individuals pursuant to the P&A Statutes;

4.  The remainder of plaintiff's motion for summary judgment is **DENIED**; and

5.  Defendants' motion for summary judgment is **DENIED**.

The Clerk of the Court is directed to enter judgment accordingly and to close the case.

IT IS SO ORDERED.

_____
United States District Judge

Dated: March 21, 2016
         Utica, New York.